**CURRIN et al. v. WALLACE, Secretary of Agriculture, et al.**

District Court, E. D. North Carolina, Raleigh Division.

April 19, 1937.

Royster & Royster, of Oxford, N. C., for complainants.

J. O. Carr, U. S. Dist. Atty., of Wilmington, Del., and Morris R. Clark, Asst. Atty. Gen., for respondents.

MEEKINS, District Judge.

It is well to state the brief history of this cause, particularly important for that it involves the constitutionality of an act of the Congress, and it is as follows:

On Saturday, October 24, 1936, complainants, without notice to respondents, filed a complaint and prayed that respondents be restrained from compulsory inspection of tobacco upon the floors of complainants. Though it was earnestly insisted by counsel for ·complainants that they were entitled, as a matter of right in the circumstances, to the relief sought, the prayer for an injunction without notice was refused. · Instead, a show cause order was entered returnable ' at Raleigh November 5, 1936. This order gave respondents more than ten days in which to prepare for the hearing or move for an adjournment.

On November 5th respondents appeared at Raleigh pursuant to notice and announced their readiness to proceed after respondent Henry A. Wallace, Secretary of Agriculture, entered a special appearance and moved to dismiss as to him. No motion was made for an adjournment and no intimation that such was desired.

At the close of the testimony and after arguments of counsel were concluded, it was announced from the bench then: "The Act is unconstitutional; discriminating in its provisions and confiscatory in its application."

Respondents did not appeal from the decision made at Raleigh, November 5, 1936. They elected to answer and have the cause heard on the merits. Upon request of respondents, extensions were granted, from time to time, in which to file answer.

The Special Term was held at Elizabeth City, February 15, 1937, having been ordered, as stated, at the request of respondents. The hearing was reported. At the close of the testimony it was, by consent of the parties, agreed that decision be withheld until the evidence taken could be transcribed by the court reporter. After the transcript had been made and furnished to complainants and respondents, respondents requested further time in which to file additional brief.

The brief of respondents was presented on the 2d day of April, 1937, and this opinion is being entered to-day—19th day of April, 1937, seventeen days after the brief was presented and considered.

The cause was instituted for the purpose of securing an order restraining the enforcement of the Tobacco Inspection Act—Public No. 134—74th Congress—H.R. 8026 (7 U.S.C.A. §§ 511–511q), and the rules and regulations promulgated thereunder, with regard to federal inspection of tobacco in the warehouses of complainants situated in Oxford, N. C., pending final determination upon the merits.

Findings of Fact.

The bill shows:

1. That complainants are engaged in selling tobacco at auction at the instance of the owner and at a price fixed by the state of North Carolina, for the profit and benefit of themselves, each being intrastate in character and engaged exclusively in an intrastate enterprise—the auction sale of tobacco upon the warehouse floors—and are neither owners nor buyers of the tobacco sold by them upon their floors.

2. That pursuant to and in consequence of the Tobacco Inspection Act, and the rules and regulations promulgated thereunder by the Secretary of Agriculture, all tobacco sold by complainants at auction for their patrons during the tobacco season of 1936–1937 was required to be inspected by employees and representatives of respondent, the Secretary of Agriculture, before it was sold.

3. That Oxford is one of the three tobacco markets within the state of North Carolina where federal inspection of tobacco prior to its sale on the floor of a tobacco warehouse is required; the other two markets are Goldsboro and Farmville.

4. That there are more than 50 tobacco warehouses in North Carolina where millions of pounds of tobacco have been sold and will be sold during the remaining portion of the 1936–1937 tobacco season and that at none of these many markets is federal inspection of tobacco required.

5. That numerous individuals, firms, and corporations within the state of North Carolina, where tobacco markets are maintained, other than at Oxford, Goldsboro, and Farmville, are engaged in precisely the same character of business as complainants, who sell tobacco at auction on their respective warehouse floors for the profit and benefit to themselves where federal inspection is not required.

6. That many of the patrons of complainants favor inspection and many of them are opposed to it, and that in consequence of the opposition of growers, who are patrons of complainants, to federal inspection, complainants have lost substantial business and therefore substantial sums of money; have suffered and sustained, and will continue to suffer and sustain irreparable loss and damage unless restrained as prayed in the Bill and have no adequate remedy at law.

At the hearing it developed from the proof through affidavits which are a part of the record and statements of counsel which were either admitted or not denied:

A. That a large quantity of the tobacco thus far sold by complainants during the tobacco season of 1936–1937 was brought by growers from the state of Virginia to the warehouses of complainants and there sold at auction after required federal inspection.

B. That a large quantity of the tobacco brought to the warehouses of complainants and sold at auction after required federal inspection was delivered by growers who are residents and citizens of the state of North Carolina and whose tobacco was seeded, set out, grown, harvested, cured, and placed upon the floors of the warehouses of complainants direct from barn to warehouse, the entire transaction being solely within the state of North Carolina.

C. That the grower retains his title and his control of his tobacco until he accepts payment from the purchaser. If the grower's tobacco fails to sell for a satisfactory price he may withdraw it from the warehouse floor and take it home, without any expense of sale, and wait for a more favorable market.

The facts in this cause are respectively set forth in the above sections 1 to 6, both inclusive, as shown by the averments in the bill, and in sections A to C, both inclusive, as shown by the proof adduced at the hearing apart from or in addition to the averments in the bill, and I so find.

Conclusions of Law.

1. That the tobacco placed upon the floors of complainants and sold after the required inspection, which was brought to complainants by growers and owners from the state of Virginia, is interstate in character.

2. That the tobacco placed upon the floors of complainants and sold after the required inspection, which was seeded, set out, grown, harvested, cured, and taken to market wholly within the state of North Carolina, is intrastate in character.

3. That the Tobacco Inspection Act is unconstitutional in its substance and materially discriminating in its application. Materially discriminating for that the required federal inspection of tobacco on the floors of complainants is not required at any of the other tobacco markets in North Carolina (except at Goldsboro and Farmville) and this material discrimination against complainants is without any valid factual reason and is without affirmative significance in law or equity and cannot be enforced in the circumstances present in this cause.

### Opinion.

■ 1. Obviously, the tobacco placed upon the floors of complainants which was brought from Virginia is interstate in character and therefore subject to required federal inspection by virtue of the commerce clause of the Constitution. Sufficient authority for this position is the Gibbons Case (Gibbons v. Ogden); 9 Wheat. 1, 6 L.Ed. 23, and subsequent cases on the same point in an unbroken line to date. If no other factor were involved in the equation, clearly the relief prayed should be denied and the bill dismissed. But if there be material discrimination against complainants, they are entitled to the relief which they seek, at least in part, notwithstanding the interstate character of the Virginia tobacco. Discussion of discrimination is pretermitted for the moment.

■ 2. The North Carolina tobacco placed upon the floors of complainants is intrastate in character, and therefore not subject to required Federal inspection. It was seeded, set out, cultivated, harvested, cured, and taken to complainants' floors over a North Carolina highway wholly within the state. Moreover, a large quantity of that particular tobacco will never enter the channels of interstate trade, for that it is taken to Durham, Winston-Salem, and other local North Carolina markets, where it is manipulated from its natural state into manufactured articles, such as chewing and smoking tobacco, cigarettes, and cigars, which are sold by the manufacturer to local North Carolina shoppers and in turn sold by them direct to local consumers.

The position of learned counsel for respondents that tobacco is inherently an interstate commodity, though boldly advanced and plausibly maintained, is without merit. There is wealth of authority that cotton is not inherently an interstate commodity. The grower's cotton in his bin or in his gin or in his storage house or in a local bonded warehouse is intrastate in character and takes on an interstate character only when it begins to move in interstate commerce. Once it assumes interstate character, cotton may move as slowly as the proverbial snail; it may come to rest in many places within and without the state of initial motion and not lose its assumed character. Once placed in the channels of interstate commerce, cotton, or any other commodity or thing in transit, moves on as such to its ultimate destination. If cotton is not inherently an interstate commodity, how can tobacco be? Upon what theory can tobacco be distinguished from cotton with this regard? The plain answer is: It cannot.

The title and control of the grower's tobacco does not pass from him even after sale at auction unless and until he accepts the purchase price. Until then the grower may withdraw his tobacco from the warehouse floor, take it home and hope for a more favorable market.

Tobacco becomes interstate in character contemporaneously with the consummation of its delivery to the purchaser who buys it to send forth in the channels of interstate trade. A local grower on his way to a local market with a truckload of local tobacco which he intends to offer for sale on a local warehouse floor is held up by a highwayman and forcibly relieved of his load. Upon apprehension, will the highwayman be subject to prosecution in the state or federal jurisdiction? Obviously, the prosecution would fall within the jurisdiction of the state wherein the crime was committed. A person steals an automobile from the garage of the owner and drives it away without crossing a state line. Would that be a violation of the Dyer Act (18 U.S.C.A. § 408)? The plain answer is: No.

The right of control of commodities such as tobacco, cotton, and other commerce until placed in the channels of interstate trade is one of the many rights not delegated to the federal government, but expressly reserved to the states by the Tenth Amendment.

3. For the sake of the argument, concede that all of the tobacco, Virginia and North Carolina, sold by complainants is inherently an interstate commodity, then complainants are entitled, at least in part, to the relief which they pray because of the material discrimination disclosed in this cause. Manifestly, the discrimination is not

passive, but active, and is without pretense or subtlety.

■ No matter how well-founded its power, the government must use it in full accord with the principle of equal rights to all and special privileges to none, not giving to one citizen a loaf and to another a stone. It must treat equally and alike each of its citizens engaged in a common enterprise. Material discrimination between citizens of the same class, that is to say, citizens engaged in like business, cannot be enforced, and its attempted indulgence, however paternal the thought or beneficent the purpose, when challenged, must yield. There is no provision, so far, for right-hand selection from those of the same class, as there was none in the New Spiritual Kingdom set up in the beginning of the first century. Indeed, the Old Dispensation commands: "Thou shalt not respect the person of the poor nor honor the person of the mighty." Equal right has come down the centuries. Battles enough have been fought for it, but not one in vain.

To say to the warehousemen in Oxford, Goldsboro, and Farmville, "thou shalt not," and to all the others in the same belt, if, indeed, not in the same zone, and engaged in the same enterprise, "thou mayest," is to make heavy the passive nonresistance of the citizen who looks to the Constitution as his refuge and his sanctuary.

The argument that federal inspection of tobacco on complainants' floors is not compulsory, but voluntary, though plausible, is specious. True, the grower in many instances has requested and respondents have furnished inspection. As between the grower and respondents, the same or similar controversy present here could not arise. The controversy is not between the grower and respondents, but between complainants and respondents. Complainants have not requested inspection and respondents have furnished none to them. Respondents maintain inspection upon the floors of complainants against their will and over their protests. To concede the argument that inspection of the grower's tobacco is voluntary does not save the point. Why? Because complainants must place the grower's tobacco upon their floors subject to inspection or refuse to accept it for sale. If they accept the tobacco subject to inspection, the grower who is opposed to it goes elsewhere—to one of the many noninspection nearby markets. If complainants refuse to accept the grower's tobacco who favors inspection, he likewise may go elsewhere, if

for no other purpose than to emphasize his support of inspection and at the same time gratify his very natural human impulse to get even with the warehousemen—punish his friendly enemy, to indulge a paradox. It is in this precise dilemma that complainants find themselves and herein lies the great pitch and moment of the discrimination complained of. There they are, much like Mahomet's coffin. Either course they elect to follow leads to a cul-de-sac. If complainants refuse inspection, they offend; if they indulge it, they offend. Here's the threat, the club and the rub. The problem of complainants is not unlike that presented in the Agricultural Adjustment Act (7 U. S.C.A. § 601 et seq.) and the so-called Bankhead Cotton Control Act (48 Stat. 598) auxiliary thereto. The cotton grower who did not sign up was subject to a penalty, called a tax, of some $25 a bale on his cotton. In spite of this provision of the act, it was contended that the sign-up was voluntary on the part of those who went in. The courts were of the opinion, and so decided, that to call a penalty a tax does not make it a tax; that a penalty is a threat and that to act pursuant to or under a threat is inconsistent with voluntary action. It is to be noted that after a brief period the Bankhead Cotton Control Act (48. Stat. 598) was repealed upon recommendation of the President.

■ Powerful as the government is, it cannot exercise even its power to tax except upon the principle of equality to all—uniformity—so that it will fall upon each payer equally and alike or its levy is void. How less can the government say to complainants, you must allow inspection of tobacco on your floors before sale, and, at the same time, say to the some forty-seven or more other local warehousemen, you may sell on your floors without inspection? If this is not illegal discrimination, then what is, or what could be? To clamp the lid down on complainants and at the same time permit their some forty-seven or more competitors to maintain an open sesame to all growers is contrary to both the letter and the spirit of equal rights uniformly applied.

The Tobacco Inspection Act is not an act to aid the collection of revenue as is the Harrison Narcotic Act (26 U.S.C.A. §§ 1040–1054, 1383–1391) held constitutional in the Doremus Case (U. S. v. Doremus), 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493, by a five to four decision. The Tobacco Inspection Act must be sustained, if sustained at all, by

the commerce clause (Const. art. 1, § 8, cl. 3) as is the Pure Food Act (21 U.S.C.A. § 1 et seq.) which was held constitutional in Weeks v. United States, 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513. The constitutionality of the Tobacco Inspection Act is not only challenged by complainants in this proceeding, but they challenge the unconstitutional application of the act by respondents in not maintaining required inspection of tobacco on the floors of the other warehousemen in the same vicinity, community, and territory. Even a constitutional act cannot be enforced in an unconstitutional way. A person can be deprived of private property but not without due process of law; private property may be taken for public use but not without just compensation. If the power to deprive and to take is arbitrarily exercised without due process or without just compensation, the net result is a great parade to no purpose. If "the power to tax involves the power to destroy," then how much more, rather than how much less, the power to discriminate involves the power to confiscate? Discrimination is confiscation. They are twin sisters of evil and can have no rightful place in the scheme of a free society bottomed on equal right uniformly applied, as in the American commonwealth.

However constitutional any act of the Congress may be, it must be administered in accord with constitutionally guaranteed rights. To administer it otherwise is repugnant to the constitutional way.

The business of tobacco warehousemen is highly competitive. They not only sharply compete with each other on the same market, but with warehousemen on other markets near by and far away.

The warehouse business is purely a private business, owned exclusively by shareholders in a corporation or as partners in a partnership or as an individual, as the case may be. This business is in no way interdependent or interlocked with the interests of the growers of tobacco but entirely independent of them as such, the business of the grower being one enterprise and that of the warehouseman being quite another. The warehouseman conducts his own business upon the floor of his own warehouse and he is in all respects an intrastate institution. So much so that the state of North Carolina has by statute regulated the auction sale of tobacco for nearly half a century.

Moreover, in the Burley Tobacco Belt in Kentucky, in the Bright Leaf Tobacco Belt in North Carolina and in the Dark Fired Tobacco Belt in Virginia the service of the warehouseman is indispensable to the tobacco industry in the mentioned belts. The industry in those belts can no more be constructively maintained without the service of the warehouseman than can the vine climb upward without support or a sawmill run without logs. And this service is as important to the grower as to the buyer.

With regard to this particularly necessary factor in the tobacco equation the Congress has not as yet legislated. The warehouseman is not mentioned in all the act, except it is provided in section 511g that he shall furnish sufficient space on the tags to accommodate the registration of the grades of the tobacco sold, et cetera. Why the warehouseman was not otherwise considered by the Congress does not appear. It may have been an oversight; it may not have been thought necessary or even expedient to do more than was done with regard to the interests of the warehouseman, and it is vain to conjecture. To repeat: They are not charged with any affirmative duty beyond that stated (511g) and are left to follow their own inclinations as they may find their interests prompt.

Upon their own floors and in their own houses complainants receive tobacco of an intrastate character in larger proportions than they receive it in interstate trade. Certainly respondents can exercise no required inspection of the intrastate commodity. How can they exercise control over the interstate product without maintaining the same requirements as to the competitors of complainants engaged in similar or the same business? To do so places the government in the position of extending favor to the grower with one hand and of striking down the warehouseman with the other. It is well to help the grower. There is and can be no complaint about that, but the grower cannot be helped if the help sacrifices the rights of others equally entitled to the protection of their property guaranteed by the Constitution.

In conclusions of law, section 3 herein, it is stated that the Tobacco Inspection Act is unconstitutional. A careful study of the act has led to this conclusion uninfluenced by any consideration other than a calm, unbiased determination to seek the meaning of the act under the Constitution. To find a way, or make one, may be the privilege

of the legislator, but this philosophy can have no place in the orderly consideration and determination of a question by one charged with the duty of judicial interpretation. The duties of the legislator may be flexible and may, with all propriety, permit him to bend commensurately with the emergency; but the judge, like Mr. Tulkinghorn, must follow the hard road of duty and exacting probity when he comes upon it, swerving neither to the right nor to the left, and announce the law as he finds it; not as he would have it. The judge must follow the trail of cold facts and the compulsive course of the law as they lead to justice administered undismayed by the threat of punishment and uncorrupted by the hope of reward. The framers of the Constitution had this in mind and made the federal judiciary independent of both in so far as humanly possible.

The purpose of the Tobacco Inspection Act is stated therein in section 2 (section 11a of title 7 U.S.C.A.), as follows: 'Transactions in tobacco involving the sale thereof at auction as commonly conducted at auction markets are affected with a public interest; that such transactions are carried on by tobacco producers generally and by persons engaged in the business of buying and selling tobacco in commerce; that the classification of tobacco according to type, grade, and other characteristics affects the prices received therefor by producers; that without uniform standards of classification and inspection the evaluation of tobacco is susceptible to speculation, manipulation, and control, and unreasonable fluctuations in prices and quality determinations occur which are detrimental to producers and persons handling tobacco in commerce; that such fluctuations constitute a burden upon commerce and make the use of uniform standards of classification and inspection imperative for the protection of producers and others engaged in commerce and the public interest therein." By the terms of the act (section 1(i) "a transaction in respect to tobacco shall be considered to be in commerce if such tobacco is part of that current of commerce usual in the tobacco industry whereby tobacco or products manufactured therefrom are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture." Subsection (i) of section 511 of title 7, U.S.C.A.

It is apparent from the language of the act itself that the Congress has sought, through an attempted exercise of the power granted by the commerce clause of the Constitution, to stabilize the prices received for tobacco by producers on local auction markets by means of inspection there conducted. This constitutes an invasion by the Congress of the Legislative Forum reserved to the several states by the Constitution. It was the evident intention, and with such intention there is no quarrel here, of the Congress to aid the tobacco grower to the extent at least of safeguarding his right to receive fair value for his product. The Congress must have clearly seen that in extending the desired aid it was dealing with an intrastate question over which it had no control, as such, and therefore sought to carry the aid to the tobacco grower through the medium or by the vehicle of the commerce clause of the Constitution (article 1, § 8, cl. 3). The vehicle employed by the Congress, however designated and by whom, was not sufficient for the intended purpose. The Butler Case (U. S. v. Butler), 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, and the Guffey Case (Carter v. Carter Coal Co.), 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, decided by the Supreme Court, although primarily dealing with questions of tax legislation, tend to support the interpretation of the Tobacco Inspection Act, as herein appears.

The case is not presently available, but an illusive fragmentary wraith of memory suggests that in one of the many cases defining the limits of the regulatory power of the Congress over commerce between the states, the late Mr. Justice Holmes, in distinguishing between those things which impose a direct burden upon such commerce, and those which affect it only indirectly, said in substance, if not in his exact words, that all would agree that commerce between the states depended upon nothing so much as upon population, but that no one would contend that, for this reason, the Congress had the power to regulate marriage and divorce.

The Congress was mindful that it could not compel inspection and grading of the grower's tobacco without his consent, hence the referendum. It is provided that if in any

zone two-thirds of the growers thereof voted for free inspection and grading of tobacco the service will be maintained in that zone without cost to the grower but not maintained otherwise in any other zone. Herein lies one of the great, if not the greatest, weakness of the act. If the Congress could not compel inspection and grading without the grower's consent, how can it compel the warehouseman, who has no interest in tobacco, either as grower, owner, or buyer, to not only suffer without remuneration inspection and grading upon his warehouse floor (and also suffer discrimination), but require him to quarter the inspectors of the government in his house and to furnish the necessary conveniences incident to inspection and grading, against his will and over his protest, to his great loss and damage as is alleged and proved, and thus take private property for public use without just compensation? Is it sufficient answer to say: Because the method of auction sale of tobacco without government inspection and grading imposes a burden upon commerce? Clearly, not. If the Congress wished to relieve commerce of the burden designated in the act—auction sale of tobacco without inspection and grading—why did it not at the same time authorize suitable government facilities for that precise purpose instead of placing that burden upon the warehouseman and subject him to a possible prison term if he fails to accept and carry it?

Moreover, just what burden precisely does the free inspection of tobacco lift from commerce? Obviously, the burden is imaginary rather than real. It will not do to accept the shadow and reject the substance.

And the referendum itself, what about it? The record discloses that in the zone under consideration the Secretary of Agriculture sent out 8,608 ballots, presumably one ballot to each grower in the zone. A total of 1,896 ballots were returned. Of the ballots returned, 1,782 were favorable to compulsory inspection and 114 of the ballots returned were unfavorable. These figures disclose that out of the total tobacco growers of 8,608 in the zone, 6,926 were either opposed or entirely indifferent to compulsory inspection. Seven thousand growers, in round numbers, out of a total of 9,000, in round numbers, were not sufficiently interested to return a ballot in a postage free envelope furnished for that purpose by the Secretary of Agriculture, except the 114 growers who responded unfavorably, and this notwithstanding the persuasive assurances printed on the back of the ballot. So far as ascertaining the sentiment of the growers in the zone as to compulsory inspection, this straw vote was as great a farce as the Literary Digest poll in 1936.

At the show cause hearing at Raleigh, November 5, 1936, the point involving delegation of the legislative power of the Congress to the Secretary of Agriculture was not stressed. However, at the Special Term at Elizabeth City, February 15, 1937, that question was presented with emphasis. It is only to read the act to conclude that the Congress not only delegated legislative power to the Secretary of Agriculture, but authorized him to redelegate that power to the grower. The Secretary was empowered to zone the tobacco belts if, when, and as he saw fit. Compulsory inspection in the zones established by the Secretary was to be had, however, only if and when two-thirds or more of the growers in a zone voted it. Under the act, the grower, not the Congress nor the Secretary, decides whether there shall be compulsory inspection. The Congress is without constitutional authority to so delegate its legislative functions. It is only to read the act to reach this conclusion. Lemke v. Farmers' Grain Company, 258 U.S. 50, 42 S.Ct. 244, 245, 66 L.Ed. 458, relied on by respondents is not in point. There, "Complainant, and other buyers of like character, are owners of elevators and purchasers of grain bought in North Dakota to be shipped to and sold at terminal markets in other States, the principal markets being at Minneapolis and Duluth." Here, complainants are the owners of their warehouses but are not buyers of the tobacco that is sold on their floors and shipped to other states and terminals therein. It is stated in respondent's brief that complainants are buyers of tobacco sold by them on their floors, but nothing in the record supports the statement. It is not only undisputed, it is admitted that complainants are merely auctioneers—criers of tobacco—the service being at the instance of the grower-owner who pays a stipulated commission for the service which is fixed by the state of North Carolina. The North Carolina statute stipulates the amounts complainants may charge the grower-owner, not only for selling, but for weighing his tobacco. This is nothing new. The state has controlled auction sales of tobacco upon warehouse floors for nearly a half century unchallenged. If complainants are engaged in an interstate business, by what authority can the state of

North Carolina exercise control of it? E converso, if complainants are engaged in an intrastate business, by what authority can the Congress exercise control of it? The answer to these questions is the key to the solution of the problem presently presented in this cause.

It is reasonable to assume that the Congress was advertent to the North Carolina Statute and reasonable to conclude that the Congress recognized its constitutional limitation with regard to control of complainants' business. Hence the indirect rather than the direct attempt to control an intrastate business.

The Tobacco Inspection Act is not valid.

An order has been passed consistent with the views expressed and the conclusions reached herein.