# CURRIN ET AL. v. WALLACE, SECRETARY OF AGRICULTURE, ET AL.

No. 275.   Argued January 4, 1939.—Decided January 30, 1939.

*Messrs. J. C. Lanier* and *B. S. Royster, Jr.,* with whom *Mr. J. W. H. Roberts* was on the brief, for petitioners.

4

*Mr. Robert K. McConnaughey* and *Solicitor General Jackson,* with whom *Assistant Attorney General Arnold* was on the brief, for respondents.

MR. CHIEF. JUSTICE HUGHES delivered the opinion of the Court.

Plaintiffs, tobacco warehousemen and auctioneers in Oxford, North Carolina, seek a declaratory judgment[1] that the Tobacco Inspection Act of August 23, 1935,[2] is unconstitutional and an injunction against its enforcement. The Circuit Court of Appeals, reversing the District Court,[3] sustained the validity of the Act and directed the dismissal of the bill of complaint. 95 F. 2d 856. We granted certiorari. 305 U. S. 584.

The Act states its scope and purpose. §§ 1, 2. It applies to transactions involving the sale of tobacco at auction as commonly conducted at auction markets. These transactions are carried on by tobacco producers and by persons engaged in the business of buying and selling tobacco in commerce as defined, that is, in commerce which is interstate or foreign or is with or within the Territories or the District of Columbia.[4] Congress finds that the

[1] Declaratory Judgment Act, 48 Stat. 955.

[2] 49 Stat. 731; 7 U. S. C. Supp. III, 511a-511 q.

[3] 19 F. Supp. 211.

[4] See § 1.

6

classification of tobacco according to type, grade, and other characteristics affects the prices received; that "without uniform standards of classification and inspection the evaluation of tobacco is susceptible to speculation, manipulation and control," and "unreasonable fluctuations in prices and quality determinations occur," constituting a burden upon commerce; and that the use of uniform standards is imperative "for the protection of producers and others engaged in commerce and the public interest therein."

The Secretary of Agriculture is authorized to investigate the handling, inspection and marketing of tobacco and to establish standards by which its type, grade, size, condition, or other characteristics may be determined and these standards are to be the official standards of the United States. §§ 3, 4.

The Secretary is authorized to designate those markets where tobacco bought and sold at auction or the products customarily manufactured therefrom move in commerce. He is not to designate a market unless two-thirds of the growers, voting at a prescribed referendum, favor it. The Act provides that after public notice that a market has been so designated, no tobacco shall be offered for sale at auction thereon until it has been inspected and certified by an authorized representative of the Secretary according to the established standards. There is a proviso that in case competent inspectors are not available or for other reasons the Secretary is unable to provide for such inspection and certification at all auction markets within a type area, he shall first designate those markets where the greatest number of growers may be served with the facilities available. § 5.

Warehousemen must provide space on warehouse tickets or other tags or labels used by them for showing the grades as determined by an authorized inspector. § 8. The Secretary is authorized to publish and distrib-

ute, without cost to the grower, timely information on the "market supply and demand, location, disposition, quality, condition, and market prices." § 9. Violation of the requirement of inspection and certification at designated markets, is made a misdemeanor punishable by a fine of not more than $1000 or imprisonment for not more than one year or both. § 12.

The market practices which led to this enactment are disclosed by the record. They are described at length in the Report of the Committee on Agriculture of the House of Representatives on the submission of the bill.[5] The growers sort their tobacco for market as best they can. It is tied in bundles or "hands" and brought to the auction warehouse where it is put in baskets, weighed, and placed in rows on the warehouse floor with a ticket on each pile. The warehousemen auction the tobacco, acting as representatives of the growers and receiving fees at rates fixed by the state law. The auction goes forward with extreme rapidity—about one basket every ten seconds—the auctioneer proceeding along one side of a row and the buyers moving with him. The auction is conducted with a technical vocabulary intelligible only to the initiated, bids being made by well-understood gestures. The sale is not completed until the grower accepts the bid; he may decline the bid and take his tobacco away. The bidders are representatives of tobacco companies and speculators who are experts in grades.[6] The Committee reported that "the possession of grade and price information by the buyers, and the lack of it on the part of the growers, places the growers under a severe handicap in the marketing of their tobacco and opens the way to abuses and practices by which farmers are victim-

---

[5] Report, Committee of Agriculture, June 5, 1935, to accompany H. R. 8026.

[6] The methods are similar to those followed in Georgia as described in *Townsend* v. *Yeomans*, 301 U. S. 441, 445.

ized. . . . It is the thought of the committee that if the purchaser needs an expert in grades in order to protect his interest in the sale the growers should be accorded the same protection." It also appears from the record that because of the speed of the sale few buyers have the opportunity to make a satisfactory examination of the tobacco and consequently many errors are made, although on the average the buyers are not supposed to suffer seriously. The effect of the methods used is to introduce an unusual degree of uncertainty in the prices which a grower may receive for tobacco of any particular grade.

· . Under the operation of the Act federal inspectors examine the tobacco about an hour before the sale. They pull samples from each pile and place tickets indicating the grade.. Each day there is displayed in the warehouse a report indicating the average price for the government grades sold on the previous day, and weekly reports are issued for the preceding week.

The Secretary promulgated regulations to be effective January 2, 1936. Later, official standard grades for flue-cured tobacco were prescribed. The Secretary designated twenty-three markets throughout the country for compulsory inspection and grading. In North Carolina tobacco was marketed on forty auction markets. Three of these, at Oxford, Goldsboro, and Farmville, were designated.[7] In view of the lack of expertly trained inspectors and graders, all markets in North Carolina could not be designated and defendants say that the markets above named were selected because in previous years the Department had established at these places voluntary inspection of tobacco under the Farm Products Inspection Act[8] and the growers were familiar with the benefits accruing from the federal action.

---

[7] A referendum was also had at Smithfield which resulted unfavorably.

[8] 7 U. S. C. 492.

In relation to Oxford, the market here in question, the required referendum was had. Upwards of 8600 ballots were distributed to growers who had sold on that market during the previous season; 1896 ballots were returned, of which 1782 were in favor of the designation. There were 248 other ballots returned, of which 96 per cent. were favorable.

Plaintiffs contend (1) that the transaction of offering tobacco for sale at auction on the warehouse floor is not a transaction in interstate commerce and hence is not subject to congressional regulation; (2) that the Act is invalid because of its discriminatory character; (3) that the Act provides for an unconstitutional delegation of legislative power; and (4) that the Act violates the due process clause of the Fifth Amendment.

The Circuit Court of Appeals found, and the record supports the finding, that there is an actual controversy between plaintiffs and defendants, entitling plaintiffs to invoke the Declaratory Judgment Act. See *Aetna Life Insurance Co.* v. *Haworth,* 300 U. S. 227, 240, 241.

*First.* Plaintiffs urge that tobacco "is not inherently an interstate commodity"; that the auction transaction is not a sale as title is not passed until the grower accepts the price; that after the auction the grower may, and often does, reject the bid and he may take his tobacco away; that the inspection required by the Act is done prior to the offering for sale; and that until sale and delivery to the purchaser the tobacco is not in interstate commerce and its control is reserved to the State. These objections are untenable. The record shows that the sales consummated on the Oxford auction market are predominantly sales in interstate and foreign commerce. The principal purchasers are few in number and in the main are engaged in the export trade or in the manufacture of tobacco products in other States. It appears that in a given week, shortly before the beginning of this suit,

approximately 2,000,000 pounds of tobacco were sold on the Oxford market, only 15.3 per cent. of which were definitely destined for manufacture in North Carolina. About 14 per cent. were in part for manufacture in North Carolina and in part for other States, and about 62 per cent. moved directly into foreign commerce. The fact that the growers are not bound to accept bids, and in certain instances reject them, does not remove the auction from its immediate relation to the sales that are consummated upon the offers that the growers do accept. The auction in such cases is manifestly a part of the transaction of sale. So far as the sales are for shipment to other States or to foreign countries, it is idle to contend that they are not sales in interstate or foreign commerce and subject to congressional regulation. Where goods are purchased in one State for transportation to another the commerce includes the purchase quite as much as it does the transportation. *Swift & Co. v. United States,* 196 U. S. 375, 398, 399; *Dahnke-Walker Milling Co. v. Bondurant,* 257 U. S. 282, 290, 291; *Lemke v. Farmers Grain Co.,* 258 U. S. 50, 54; *Stafford v. Wallace,* 258 U. S. 495, 519; *Flanagan v. Federal Coal Co.,* 267 U. S. 222, 225; *Shafer v. Farmers Grain Co.,* 268 U. S. 189, 198; *Foster-Fountain Packing Co. v. Haydel,* 278 U. S. 1, 10.

There is no permissible constitutional theory which would apply this principle to purchases of livestock as in the *Swift* and *Stafford* cases, and of grain as in the *Lemke* and *Shafer* cases, and deny its application to tobacco. In the *Lemke* case (*supra,* at pp. 60, 61), condemning the effort of a State to control the buying of grain for shipment to other States, the Court referred to the power of Congress to provide its own regulation for such transactions, saying: "It is alleged that such legislation is in the interest of the grain growers and essential to protect them from fraudulent purchases, and to secure payment to them of fair prices for the grain actually sold. This

may be true, but Congress is amply authorized to pass measures to protect interstate commerce if legislation of that character is needed." And again, in the *Shafer* case (*supra,* at pp. 188, 198), the Court said: "The right to buy it [grain] for shipment, and to ship it in interstate commerce is not a privilege derived from state laws and which they may fetter with conditions, but is a common right, the regulation of which is committed to Congress and denied to the States by the commerce clause of the Constitution."

The fact that intrastate and interstate transactions are commingled on the tobacco market does not frustrate or restrict the congressional power to protect and control what is committed to its own care. As we said in the *Shreveport* case, 234 U. S. 342, 351, 352, with respect to the intrastate rates of interstate carriers—"Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the State, and not the Nation, would be supreme within the national field." See, also, *Minnesota Rate Cases,* 230 U. S. 352, 399; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 588; *Stafford* v. *Wallace, supra,* at p. 522. Here, the transactions on the tobacco market were conducted indiscriminately at virtually the same time, and in a manner which made it necessary, if the congressional rule were to be applied, to make it govern all the tobacco thus offered for sale.

Having this authority to regulate the sales on the tobacco market, Congress could prescribe the conditions under which the sales should be made in order to give protection to sellers or purchasers or both. Congress is not to be denied the exercise of its constitutional author-

ity in prescribing regulations merely because these may have the quality of police regulations. It is on that principle that misbranding under the Food and Drugs Act [9] embraces false or misleading statements as to the ingredients of commodities or the effects of their use. See *Seven Cases* v. *United States,* 239 U. S. 510. Inspection and the establishment of standards for commodities has been regarded from colonial days as appropriate to the regulation of trade; and the authority of the States to enact inspection laws is recognized by the Constitution. Art. I, §10, par. 2. See *Turner* v. *Maryland,* 107 U. S. 38, 51–54; *Pacific States Co.* v. *White,* 296 U. S. 176, 181. But the inspection laws of a State relating to exports or to articles purchased for shipment to other States are subject to the paramount regulatory power of Congress. *Turner* v. *Maryland, supra,* at pp. 57, 58. And Congress has long exercised this authority in enacting laws for inspection and the establishment of standards in relation to various commodities involved in transactions in interstate or foreign commerce.[10] The fact that the inspection and grading of the tobacco take place before the auction does not dissociate the former from the latter, but on the contrary it is obvious that the inspection and grading have immediate relation to the sales in interstate and foreign commerce which Congress thus undertakes to govern.

In *Townsend* v. *Yeomans,* 301 U. S. 441, we recently had under consideration the legislation of Georgia prescribing maximum charges for the services of tobacco

---

[9] 21 U. S. C. 10.

[10] See, e. g., United States Cotton Standards Act, 7 U. S. C. 51–65; Food and Drugs Act, 21 U. S. C. 14a, 15, 20, 41, 71, 74, 89, 143; United States Warehouse Act, 7 U. S. C. 243; Certification of condition, etc. of agricultural products shipped in interstate commerce, 7 U. S. C. 414; Farm Products Inspection Act, 7 U. S. C. 492; Perishable Agricultural Commodities Act, 7 U. S. C. 499n.

warehousemen who conducted their business in a manner similar to that prevailing in North Carolina. There, the warehousemen strongly insisted that they were engaged in interstate and foreign commerce, as the tobacco sold on their floors was destined for interstate or foreign shipment, and hence that the State was without power to fix their fees. They invoked the federal Act in support of their contention. But we found nothing in the federal Act which undertook to regulate the charges of warehousemen and hence we concluded that Congress had restricted its requirements and left the State free to deal with the matters not covered by the federal legislation and not inconsistent therewith. The authority of Congress to enact the Tobacco Inspection Act was not questioned.

*Second.* Plaintiffs complain that the Act is discriminatory. They say that warehousemen on other tobacco markets in North Carolina, doing the same sort of business and competing for patronage among the same growers, are at liberty to conduct sales in their warehouses without inspection and certification.

The reason for the selection is shown. The lack of a sufficient number of expert inspectors made it impracticable to supply inspection and grading at all tobacco auction markets. Having this practical difficulty in mind, Congress directed that when for that reason or others the Secretary was unable to provide for inspection and certification at all such markets within a type area, he should first designate those where the greatest number of growers may be served with the facilities that are available. § 5. We do not doubt that such a selection was within the congressional power.

We have repeatedly said that the power given to Congress to regulate interstate and foreign commerce is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed

in the constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. To hold that Congress in establishing its regulation is restricted to the making of uniform rules would be to impose a limitation which the Constitution does not prescribe. There is no requirement of uniformity in connection with the commerce power (Art. I, § 8, par. 3) such as there is with respect to the power to lay duties, imposts and excises (Art. I, § 8, par. 1). *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311, 327. Undoubtedly, the exercise of the commerce power is subject to the Fifth Amendment (*Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Cress,* 243 U. S. 316, 326; *Louisville Bank* v. *Radford,* 295 U. S. 555, 589); but that Amendment, unlike the Fourteenth, has no equal protection clause. *LaBelle Iron Works* v. *United States,* 256 U. S. 377, 392; *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 584.

If it be assumed that there might be discrimination of such an injurious character as to bring into operation the due process clause of the Fifth Amendment, that is a different matter from a contention that mere lack of uniformity in the exercise of the commerce power renders the action of Congress invalid. For that contention we find no warrant. It is of the essence of the plenary power conferred that Congress may exercise its discretion in the use of the power. Congress may choose the commodities and places to which its regulation shall apply. Congress may consider and weigh relative situations and needs. Congress is not restricted by any technical requirement but may make limited applications and resort to tests so that it may have the benefit of experience in deciding upon the continuance or extension of a policy which under the Constitution it is free to adopt. As to such choices, the question is one of wisdom and not of power.

*Third.* The argument that there is an unconstitutional delegation of legislative power is equally untenable. This is not a case where Congress has attempted to abdicate, or to transfer to others, the essential legislative functions with which it is vested by the Constitution. Art. I, § 1; § 8, par. 18. See *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421; *Schechter Corporation* v. *United States,* 295 U. S. 495, 529, 541, 542, 553. We have always recognized that legislation must often be adapted to conditions involving details with which it is impracticable for the legislature to deal directly. We have said that—"The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility." *Panama Refining Co.* v. *Ryan, supra.* In such cases "a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *Wayman* v. *Southard,* 10 Wheat. 1, 43. We think that the Tobacco Inspection Act belongs to that class.

So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market "unless two-thirds of the growers voting favor it." Similar conditions are frequently found in police regulations. *Cusack Co.* v. *Chicago,* 242 U. S. 526, 530. This is not a case where a group of producers may make the law and force it upon a minority (see

16

*Carter* v. *Carter Coal Co.,* 298 U. S. 238, 310, 318) or where a prohibition of an inoffensive and legitimate use of property is imposed not by the legislature but by other property owners (see *Washington ex rel. Seattle Trust Co.* v. *Roberge,* 278 U. S. 116, 122). Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions. The distinction was pointed out in *Hampton & Co.* v. *United States,* 276 U. S. 394, 407, where, in sustaining the so-called "flexible tariff provision" of the Act of September 21, 1922,[11] and the authority it conferred upon the President, we said: "Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be effected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district."

Nor is there an unconstitutional delegation to the Secretary of Agriculture. Congress has set forth its policy for the establishment of standards for tobacco according to type, grade, size, condition, and other determinable characteristics. §§ 3, 4. The provision that the Secretary shall make the necessary investigations to that end and fix the standards according to kind and quality is

[11] 42 Stat. 858, 941, 942.

plainly appropriate and conforms to familiar legislative practice as shown by the various statutes already mentioned.[12] It is not different in principle from the authority conferred upon the Secretary of the Treasury to establish " 'uniform standards of purity, quality and fitness for consumption of all kinds of teas imported into the United States' " (Buttfield v. Stranahan, 192 U. S. 470, 494), or from that conferred upon the Interstate Commerce Commission to fix standards for safety devices and equipment (St. Louis, I. M. & S. Ry. Co. v. Taylor, 210 U. S. 281, 286, 287; Napier v. Atlantic Coast Line, 272 U. S. 605, 612), or from that conferred upon the Secretary of War to determine whether bridges and other structures constitute unreasonable obstructions to navigation and to specify and prescribe the structural changes that are required (Union Bridge Co. v. United States, 204 U. S. 364).

The Secretary of Agriculture is authorized to designate those markets where tobacco bought and sold thereon at auction moves in commerce. § 5. This calls for the ascertainment of a fact. The intention of Congress is clear that markets thus ascertained shall be designated subject to the prescribed conditions and as rapidly as facilities for inspection are available. We find no unfettered discretion lodged with the administrative officer. The requirement of a referendum, as already noted, calls for the expression of the wishes of the growers and the Secretary acts merely as an administrative agent in conducting the referendum. The provision for the suspension of a designated market because competent inspectors are not available or the quantity of tobacco is not enough to justify the cost of the service, sets forth definite as well as reasonable criteria. The statute also lays down a practical rule for the guidance of the Secretary in the

---

[12] See Note 10.

selection of markets in the event that because of lack of inspectors or other reasons the Secretary is unable to furnish inspection and certification at all auction markets within a type area. In that case he is first to designate those auction markets "where the greatest number of growers may be served with the facilities available to him."

The statute thus defines the policy of Congress and establishes standards within the framework of which the administrative agent is to supply the details. The provisions of the Act are well within the principle of permissible delegation which we applied in relation to the administration of the forest reserve in *United States* v. *Grimaud*, 220 U. S. 506, 517; to the allocation of licenses, wave lengths, etc. in *Federal Radio Comm'n* v. *Nelson Bros. Co.*, 289 U. S. 266, 285; and to the exercise of the powers conferred upon the Interstate Commerce Commission in *New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 24.

Nor does it appear that, in his use of his authority in the instant case, the Secretary has acted in an arbitrary and capricious manner. As he did not have an adequate corps of experts to supply all the North Carolina markets, he selected those where there had been voluntary inspection under the prior Act.[13] It cannot be said that this was an unreasonable course.

*Fourth.* Finally, plaintiffs invoke the due process clause of the Fifth Amendment. Plaintiffs are warehousemen and auctioneers acting as agents for the growers who own the tobacco and pay their commissions. Plaintiffs are thus in the position of contesting a regulation for the benefit of their principals because of an alleged interference with their business. The Act does not affect their rate of charges and does not deprive them of any prop-

---

[13] Farm Products Inspection Act, 7 U. S. C. 492.

erty. The growers, to be sure, may take their tobacco where they please. But even if it were assumed that the contention that the markets subject to the inspection provision would lose patronage could afford ground for resisting this sort of regulation, otherwise valid, the claim in this instance rests more on conjecture than on proof. We agree with the Circuit Court of Appeals that as to the asserted difference of prices obtainable on inspected markets, as compared with those not inspected, the evidence has little probative value and that the loss of business from growers who do not desire the inspection would seem by the record to be more than counterbalanced by the gain of business from those who desire it. 95 F. 2d p. 861.

The decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER dissent.