**UNITED STATES v. KRECHTING, and nine other cases.**

Nos. 1043, 1045, 1048–1051, 1054–1057.

District Court, S. D. Ohio, W. D.

Feb. 11, 1939.

Berkley Henderson, Sp. Asst. Atty. Gen., Mary Connor Myers, Atty. in Department of Agriculture, of Washington, D. C., and Frederic W. Johnson, Asst. U. S. Atty., of Cincinnati, Ohio, for the United States.

Sanford A. Headley, James G. Headley, and Michael C. Lacinak, all of Cincinnati, Ohio, for defendants.

DRUFFEL, District Judge.

The above-entitled cases were commenced by the United States of America against defendants to enforce compliance with Order No. 22 relating to handlers of milk, issued by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., and to prevent and restrain the defendants from handling milk in the current of interstate commerce, or so as directly to burden, obstruct or affect such commerce in milk in the Cincinnati, Ohio, marketing area.

The defendants deny that they are engaged in interstate commerce in any manner or form whatever. They contend that Order No. 22 is void and of no effect for the reason that it was illegally promulgated; that it is an unlawful delegation of legislative power and is contrary to the Constitution, U.S.C.A., and particularly Article 1, Section 1; and that it constitutes a taking of property in violation of the Fifth Amendment to the Constitution of the United States, U.S.C.A.

At the trial the parties stipulated that defendants Krechting and Willer receive part or all of their milk from Indiana; that it is processed in Hamilton County, Ohio, and sold there; that as to the other defendants all milk handled by them is produced and sold in the State of Ohio; that all of the defendants have failed to comply with Order No. 22, and that there be a joint trial.

From the evidence offered at the trial, including the record of the preliminary proceedings, it appears, and the court finds as a matter of fact, that pursuant to Section 10(c) of the Act, 7 U.S.C.A. § 610(c),

the Secretary, on November 12, 1937, gave notice of a public hearing on a proposed marketing agreement and a proposed order regulating the handling of milk in the Cincinnati, Ohio, marketing area; that following said notice and a subsequent notice, public hearings were held on January 4, 5, 6, 7 and 20, and February 2, 3 and 4, 1938, at Cincinnati, and evidence for and against the proposed marketing agreement and proposed regulation was received by the presiding officer specially designated by the Secretary of Agriculture for the purpose; that at said hearings evidence was presented showing that because of the unstable and chaotic conditions in the milk industry the legislature of Ohio in 1935 passed what was known as the Burke law as a temporary expedient to permit of voluntary pooling by milk producers; that because of the expiration of the Burke law there was an immediate and constant threat of a breakdown in the production, distribution and price structure of the milk industry in the Cincinnati Marketing Area; that in June, 1937, of the milk received in the Cincinnati Marketing Area, 62% was produced in Ohio, 12.9% in Indiana, and 25.1% in Kentucky, said percentages varying from month to month.

There was also evidence that some producers and their handlers were in a preferred position because their business consisted principally of the distribution of Class I milk (bottled milk), at contract prices lower than the proposed prices; that other handlers were at a disadvantage because they were being forced to take a disproportionate share of the surplus milk to support the market, and that if and when the order became effective the first group would not only lose their favorable status but would be forced to assume a share in the distribution of surplus milk, to the advantage of the large users of Class III milk (milk products).

Said proposed Order No. 22 provided for the following classification and price:

Class  I milk (Milk or Milk Drinks) $2.75 per cwt.
Class II milk (Cream,    Buttermilk,
           Cottage Cheese) ..... $2.00  "   "..
Class III milk (Milk  Products  other
           than Class II)........ The price per
    hundredweight which shall be calculated by
    the market administrator as follows:
    multiply by 4 the average price per pound of
    92-score butter at wholesale in the Chicago
    market, etc.

The foregoing may be taken to fairly represent the position of the contending groups, minus the heat and intense feeling expressed at the hearings as more fully appear in the transcript of the proceedings.

Upon said evidence, and with a view to carrying out the purposes of the Act, the Secretary made the findings required and executed the tentatively approved marketing agreement, and thereupon designated an agent to conduct a referendum among the producers who were supplying milk to the Cincinnati area, in accordance with the Act. As to said referendum it appeared that the agent for the Secretary secured from the Cincinnati Board of Health a list of four thousand producers who were shipping milk to the Cincinnati area during the month of January, 1938, which had been determined as a representative period. Of those producers eligible to vote in the referendum, approximately six hundred did not belong to cooperative associations. To those producers was sent a ballot, a copy of a letter of instructions as to voting, a copy of the tentatively approved marketing agreement, and a self-addressed return envelope for their use in mailing the ballot. To each of the three cooperative associations in the area was sent a ballot in which to record the vote of the members in accordance with the requirements of the Act. As a result of the referendum thirty-four hundred producers, through the officers of the cooperatives, voted in favor of the agreement and proposed regulations; of the non-cooperative producers, forty-two voted in favor of and forty-two against, the others either not voting or returning defective ballots. On the basis of the vote the Secretary determined that 98.4% by number of the producers voting, and 97.6% by volume, were in favor of the proposed market agreement and proposed regulations, and accordingly issued said Order No. 22.

█ The plaintiff has sustained the burden of proof as to the regularity and validity of the proceedings and issuance of Order No. 22, and of its right to prevail on the issues joined herein.

From the foregoing the court concludes as a matter of law that:

█ 1. The Secretary has complied with the requirements of the Agricultural Marketing Agreement of 1937, in the issuance of Order No. 22, that said order is valid, and that the defendants herein are obliged to comply therewith.

2. Said Act is not contrary to Article 1, Section 1, of the Constitution, and does not constitute a taking of property in violation of the Fifth Amendment to the Constitution.

Although counsel for defendants have cited many authorities on the subject of the constitutionality of the Act itself, this court feels that the very recent decision of the Supreme Court, D. T. Currin et al. v. Henry A. Wallace, Secretary, 59 S.Ct. 379, 83 L.Ed. ——, upholding the constitutionality of the Tobacco Inspection Act, 7 U.S.C.A. § 511 et seq., a companion piece of legislation, is controlling here, and that therefore it is unnecessary to refer to or discuss the other authorities on that subject.

Counsel for defendants have also cited a number of District Court decisions relating to milk handlers, in which cases the courts held said handlers, not being engaged in interstate commerce, were not subject to the Marketing Agreement Act. A careful examination of the facts in all those cases discloses that the milk was all produced and sold locally, except in one case where the evidence showed that one-tenth of one percent was shipped beyond the boundary of the state. In the instant cases all defendants but two are selling milk produced in Ohio in the Cincinnati Market; the other two, Witsken and Willer, are selling milk produced in Indiana in the Cincinnati Marketing Area, in competition with complying handlers in the Cincinnati Area, handling milk from Ohio, Indiana and Kentucky in varying percentages.

Whether or not the defendants are engaged in the business of handling milk in the current of interstate commerce, or which directly burdens or affects interstate commerce, must depend upon whether their business is to be treated as local and individual, or whether the milk industry in the marketing area is to be treated as an entirety. In Nebbia v. New York, 291 U.S. 502, 517, 54 S.Ct. 505, 507, 78 L.Ed. 940, 89 A.L.R. 1469, the Supreme Court said: "The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control. Under the best practicable adjustment of supply to demand the industry must carry a surplus * * * because milk, an essential food, must be available as demanded by consumers every day in the year, and demand and supply vary from day to day and according to the season; but milk is perishable and cannot be stored. * * * Thus surplus milk presents a serious problem, as the prices which can be realized for it for other uses are much less than those obtainable for milk sold for consumption in fluid form or as cream. A satisfactory stabilization of prices for fluid milk requires that the burden of surplus milk be shared equally by all producers and all distributors in the milkshed."

Necessarily, to accomplish its objects and purposes, Congress intended to deal with the industry as a whole and its efforts would be futile if individual handlers and producers were permitted to pursue their own individual and separate courses, as defendants here contend. There are many decisions holding that the seeming private character of a business does not necessarily remove it from the realm of regulation in the public interest.

Defendants specifically complain that they have contracts with their producers at a lower price than that fixed by the order; that although their producers will receive a higher price for Class I milk under the order than now, that when they assume their proportionate burden of the disposition of the surplus milk, their net price will be much lower than their present contracts provide; that this constitutes a taking of defendants' property contrary to the Fifth Amendment, etc. The identical point was raised by the milk dealers in the Nebbia case, supra, and decided by the Supreme Court, page 527, 54 S.Ct. page 510:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. * * *"

It may be conceded that defendants will lose their present favorable status, by rea-

270

son of Order No. 22, but unless they assume their proportionate share of the burden of the orderly disposition of the surplus milk, their present favorable position is only temporary, as they are always vulnerable to attacks of price cutting and unfair competition.

The Act itself recognizes that inequities may arise from time to time and provides that the Secretary may amend orders to meet constant changing conditions.

Counsel for defendants also contend that this court cannot blind itself to the events of the past week in this milk market which have demonstrated the futility of Order No. 22, and the futility of official fiat as a means of controlling the operation of economic forces. As to this contention the Supreme Court in the Nebbia case, page 537, 54 S.Ct. page 516, say: " * * * With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. * * * Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. * * *"

The validity of the Act being definitely established in the opinion of this court by the decision of the Supreme Court in Currin v. Wallace, this court has no alternative but to grant the prayer of plaintiff in its Bills of Complaint, and it is so ordered. Exceptions for defendants.