## OPP COTTON MILLS, Inc., v. ADMINISTRATOR OF WAGE AND HOUR DIVISION OF DEPARTMENT OF LABOR.

### No. 9313.

Circuit Court of Appeals, Fifth Circuit.

April 2, 1940.

Rehearing Denied May 16, 1940.

---

5 Cf. White v. United States, 305 U. S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172.

6 48 Stat. 680, 686, 687, 26 U.S.C.A. Int.Rev.Acts, page 670.

24

Ben F. Cameron, of Meridian, Miss., W. Gordon McKelvey, of Nashville, Tenn., Tyre Taylor, of Washington, D. C., Gessner T. McCorvey, of Mobile, Ala. and Hobart A. McWhorter, of Birmingham, Ala., for petitioner.

George A. McNulty, Gen. Counsel, United States Department of Labor, Irving J. Levy, Asst. Gen. Counsel, United States Department of Labor, and Louis

Sherman, all of Washington, D. C., Conley Merchant, Regional Atty., Department of Labor, of Birmingham, Ala., and Robert L. Wright, Sp. Asst. to Atty. Gen., Joseph L. Rauh, Asst. Gen. Counsel, Walter D. Murphy, Bessie Margolin, and C. Ira Funston, all of Washington, D. C., for respondent.

Before HOLMES and McCORD, Circuit Judges, and MIZE, District Judge.

McCORD, Circuit Judge.

The Administrator of the Wage and Hour Division of the Department of Labor issued a wage order on September 29, 1939, providing that effective October 24, 1939, wages at a rate of not less than 32½ cents an hour be paid to all employees in the textile industry. The wage order was issued pursuant to the provisions of the Fair Labor Standards Act of 1938, 52 Stats. p. 1060, 29 U.S.C.A. § 201 et seq.

Opp Cotton Mills, Inc., operator of a small cotton mill at Opp, Alabama, petitioned this court to review and set aside the uniform minimum wage order. Southern Cotton Manufacturers Association, an unincorporated group representing small cotton mills in Texas and other Southern states, and fifteen concerns operating cotton mills in Georgia, Alabama, Mississippi, and Louisiana filed intervention petitions. This proceeding is before us under the provisions of Section 10(a) of the Act.

The petitioners contend that the Act is unconstitutional; that the Administrator did not give consideration to the factors required by the statute; and that his order fixing a uniform minimum wage of 32½ cents an hour for the textile industry is illegal and void.

It is provided by Section 6 of the Act that every employer engaged in interstate commerce or in the production of goods for interstate commerce shall pay wages of (1) not less than 25 cents an hour during the first year after the effective date of the section; (2) not less than 30 cents an hour during the next six years; and (3) after seven years "not less than 40 cents an hour, or the rate (not less than 30 cents an hour) prescribed in the applicable order of the Administrator." Sections 5 and 8 provide administrative machinery for establishing hourly wage rates in excess of the statutory minimum of 30 cents, but not in excess of 40 cents an hour. The 25 cent minimum hourly wage provided for by Section 6(a)(1) was in effect for one year, and on the day the 30 cents hourly minimum provided for by Section 6(a)(2) was to take effect the wage order here attacked · raised the minimum to 32½ cents.

A further provision made it the duty of the Administrator to appoint industry committees, and on September 13, 1938, acting pursuant to Section 5, the Administrator appointed Industry Committee No. 1 for the textile industry. This committee consisted of 21 members, seven representing the public, seven representing employers, and seven representing employees. Section 5(b) provides that those representing each group of the industry committees be appointed with "due regard to the geographical regions in which the industry is carried on." The Administrator appointed three members of the public group, four members of the employers group, and two members of the employees group from Southern states, but the petitioners contend that the South was not given full and proper representation. The provisions of the Act requiring the Administrator to give "due regard" to geographical regions in the appointment of committee members did not require him to apportion membership on the committee with mathematical precision. It was the duty of the Administrator to exercise sound discretion in this regard and we do not find that he abused that discretion. Cf. Ralston Steel Car Co. v. Commissioner, 6 Cir., 53 F.2d 948, 950; United States v. Interstate Commerce Commission, 66 App. D.C. 398, 88 F.2d 780, 783.

The duty of Industry Committee No. 1 was to investigate conditions in the textile industry and "recommend to the Administrator the highest minimum wage rates * * * which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." Section 8 (c) further provides that the industry committee recommend such reasonable classifications within an industry as it determines to be necessary, and that in determining such classifications "the industry committee and the Administrator shall consider among other relevant factors the following: (1) competitive conditions as affected by transportation, living, and production costs; (2) the wages estab-

lished * * * by collective labor agreements * * *; and (3) the wages paid for work of like or comparable character by employers who voluntarily maintain minimum-wage standards in the industry." The committee functions in an investigatory and advisory capacity and the Act makes no provision for a court review of the proceedings before it. The record shows, however, that for several months Industry Committee No. 1 made a detailed and exhaustive study of the problems confronting the textile industry, and heard many witnesses, and considered many briefs, exhibits, letters, and statistical and economic studies. Petitioners' complaint that the committee did not proceed in accordance with the provisions of the Act is not well founded. Cf. United States v. Los Angeles & S. L. R. R., 273 U.S. 299, 310, 47 S.Ct. 413, 71 L.Ed. 651; United States v. Atlanta, B. & C. R. Co., 282 U. S. 522, 527, 528, 51 S.Ct. 237, 75 L.Ed. 513.

On May 22, 1939, Industry Committee No. 1, by a vote of 13 to 6, adopted a resolution recommending a uniform minimum wage of 32½ cents an hour for the textile industry. On the coming in of the committee's report and recommendations the Administrator published notice of a public hearing in the Federal Register, trade journals, and newspapers, as provided by the Act. The notice advised that any interested person might appear at the hearing to offer evidence "either on his own behalf, or on behalf of any other persons * * *." The Administrator's hearing was opened in Washington on June 19, 1939, adjourned to Atlanta on June 26th, reconvened in Washington on July 10th and on July 11th the hearing was concluded. At the hearing the Administrator heard over 100 witnesses, including employers, employer representatives, labor representatives, freight experts, government economists, and economic experts. The testimony taken at the hearing measured to more than 3,000 pages, and many volumes of exhibits were received and made a part of the record. Thereafter the Administrator prepared extensive findings based upon the evidence taken at the hearing. After reviewing all the evidence he found that the recommendations of Industry Committee No. 1 were made in accordance with law and supported by the evidence. On the basis of these findings he issued the order fixing a uniform minimum wage for the industry.

The record before us consists of more than ten thousand pages of testimony and exhibits. Much acrimony and bitterness is exhibted in the testimony of several of the witnesses. No good purpose could be served by setting out the evidence at length, and we only attempt to point out the trend and weight of the evidence as reflected by a careful reading of the voluminous record. From the testimony of the long line of witnesses favorable to petitioners we quote only a few excerpts:

Clarence Miller of Dallas, Texas, connected with several cotton mills testified, "If the Fair Labor Standards Act is enforced according to the recommendations of the majority of the committee, without a differential, and the freight discriminations are not removed, there will not be a cotton mill operating in Texas at the end of five years." M. M. Bryan, president and general manager of the Jefferson, Georgia Mills testified, "Regardless of what effect the increase in minimum wages may have upon the company I represent, I believe any minimum wage law will ultimately prove to be unwise and a serious detriment to the industrial progress of our country." J. F. Ames, Selma, Alabama, with over fifty years' experience in the cotton mill manufacturing business, testified, "Great disaster will overtake the small mills in the event the proposed rate of 32½ cents an hour goes through." Governor Hugh White of Mississippi and Governor Frank Dixon of Alabama offered strong evidence favorable to petitioners. Dr. Gus W. Dyer of Vanderbilt University testified, "Now, if you believe in this principle of making the strong stronger and the weak weaker, and that the function of government is to look after the strong and let the weak go to hell, then I can see some reason for it, but otherwise, I can't." Donald Comer of Birmingham, Alabama, connected with Avondale Cotton Mills, with clarity and without prejudice, offered quite the strongest evidence for the petitioners that is to be found in the record. On the question of transportation and freight rates L. O. Kimberly, Jr., of Atlanta, who had eighteen years' experience in freight traffic work and who had spent much time studying textile freight rates, testified that he had made "a study of the rate levels in the North and in the South and between the territories. * * * I believe I am fairly well familiar with the rate structure on these products. * * * The combination of these inbound rates on cotton

and the outbound rates on manufactured cotton products gives the Eastern mills a substantial advantage." Using Boston and Atlanta as focal points from which to base his estimate, he placed the Southern Base Group mill points as having a rate disadvantage of 17.5 per cent. P. H. Johansen, Washington, D. C., who had thirteen years' experience in freight rates, six years of which were with textile rates, testified, "The average rate from New England to all points, however, is 100.90 cents, and the average rate from the South is 114.06; or an average of 13.04 per cent against the Southern mills. * * * I would like to remark here that is a simple mathematical average. Later I believe I can show the disadvantage is much greater than that. * * *."

In opposition to the testimony of the witnesses favorable to petitioners was the testimony of experts of the National Association of Cotton Manufacturers, the American Cotton Manufacturers Association, and several state trade associations. Also many exhibits and statistical studies were introduced to show living and production costs, and freight rates on raw materials, mill supplies, and textile products from more than three hundred representative destinations and shipping points throughout the country.

■ Much of the evidence before the Administrator is in sharp conflict. We are constrained to believe, however, that a preponderance of the evidence discloses that there is a decided rate disadvantage as against the Southern and Southwestern mills. However this may be, a majority of Industry Committee No. 1, after an exhaustive investigation lasting several months, recommended to the Administrator a uniform minimum wage of 32½ cents an hour for the textile industry. The Administrator gave notice and held a public hearing as provided by the Act. After taking much testimony and considering it along with the committee report and various statistical studies, including a comprehensive wage study known as Bulletin 663 prepared by the Bureau of Labor Statistics, he confirmed the report of the committee, holding: "I conclude, therefore, that the South is at least in a position of equality with the North as far as production costs are concerned and that with respect to production, transportation and living costs considered together there is also substantial equality between the

regions. I find, too, that competitive conditions as affected by transportation, living and production costs do not justify a differential in minimum wage rates." He also found that "the proposed minimum will not substantially curtail employment in the cotton textile industry or in any definable group of plants or regions of the industry."

■ Under Section 10(a) of the Act the review of this court is limited to questions of law, and the findings of fact by the Administrator are conclusive if supported by substantial evidence. Whatever discrimination may be pointed out in the conflicting evidence, labor should not be called upon to equalize the discrimination by bearing all the load. The minimum wage fixed by the order of the Administrator provides a weekly earning of approximately thirteen dollars. When one takes into consideration living expenses scaled down to the necessities of life it can readily be seen that the minimum fixed by the Administrator's wage order provides, at most, a meager living. Substantial evidence can be found in the record to support the findings of the Administrator and we are not willing, therefore, to overturn his order. Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126; Labor Board v. Brown Paper Mill Co., 5 Cir., January 17, 1940, 108 F.2d 867; Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077; Labor Board v. Waterman Steamship Corp., February 12, 1940, 60 S.Ct. 493, 84 L.Ed. ——.

■ In passing upon the constitutionality of the Act it is not necessary to determine whether all provisions are within the power of Congress. Section 19 provides for separability of provisions, and only those provisions affecting this proceeding are passed upon. If other provisions in the Act exceed the power of Congress they are clearly separable and do not vitiate the Act. Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 433, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

■ The power of Congress to regulate commerce "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23.

■ In enacting the Fair Labor Standards Act of 1938 Congress sought to conserve interstate commerce and protect it

from the burdens and obstructions incident to the transportation of goods produced under substandard working conditions. Any doubts that may have existed heretofore as to the constitutionality of such legislation have been dispelled by recent decisions of the Supreme Court. We are of opinion and so hold that the enactment of the Fair Labor Standards Act was a valid exercise of the power given to Congress by the commerce clause of the federal constitution, Article 1, Section 8, Clause 1. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Kentucky Whip & Collar Co. v. Illinois Central Railroad Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Santa Cruz Co. v. Labor Board, 303 U.S. 453; Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; see Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724.

The policy of Congress is precisely defined in the Act. It prescribes definite standards for the guidance of administrative action, and indicates in detail the considerations which are to be held in view in promulgating wage orders. To protect against arbitrary action Congress "has afforded both administrative and judicial review to correct errors. This is not to confer unrestrained arbitrary power on an executive officer." We are of opinion that the delegation of power to the Administrator was not unconstitutional. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 653, 83 L.Ed. 1092; Currin v. Wallace, 306 U. S. 1, 59 S.Ct. 379, 83 L.Ed. 441; United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446; Hampton & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

The procedure followed by the Administrator in adopting the recommendations of the industry committee was in accord with the due process requirements of the constitution. Proper notice was given of the public hearing before the Administrator and the petitioners were given full opportunity to be heard. The administrative proceedings met the "rudi-

mentary requirements of fair play" held to be essential to due process. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129. The Fair Labor Standards Act of 1938 as applied to these petitioners is constitutional.

The wage order of the Administrator measures to the requirements of the Act.

The wage order is affirmed.