400

LARSEN BAKING Co., INC., et al., Respondents, *v.* CITY OF NEW YORK, Appellant.

Second Department, July 22, 1968.

*J. Lee Rankin, Corporation Counsel (Stanley Buchsbaum* and *Donald E. Biederman* of counsel), for appellant.

*Scribner & Miller (Herbert Plaut* of counsel), for respondents.

CHRIST, J. The principal issue on this appeal is whether, in computing the amount of an industrial user's sewer surcharge, its excess pollutant concentration must be tested individually, or whether it may be calculated on the basis of an average for the industry obtained by testing a number of plants constituting a representative cross section of the industry.

Section 687–1.0 of the Administrative Code of the City of New York (Local Laws, 1961, No. 2 of City of New York, § 1, eff. March 1, 1961 [§ 12]) was designed to combat pollution by requiring industries that contribute thereto to help pay the cost of treating it. It provides that sewage or industrial wastes containing pollutants in excess of permissible levels may not be discharged into the sewer system except with the permission of the Commissioner of Public Works of the city and according to rules and regulations to be adopted by him. Among other things, it is provided that firms may be required to install such equipment

as is necessary to allow accurate gauging and sampling of their wastes, at their own expense. The surcharge is to be based upon a formula in which, essentially, the average concentration of excess pollutants in a user's sewage is multiplied by the estimated volume thereof; and the product of these two factors is in turn multiplied by the unit cost of treatment in the city's sewage treatment plants. Any excess over the stated allowable concentration is to be surcharged.

The sewer rent is based upon the water supply to a given property "except as otherwise provided" (Administrative Code, § 683a4-9.0, subd. b). Where the use to which a property is devoted is such that the water supplied cannot be entirely discharged into the sewer system, the Commissioner of Water Supply, Gas and Electricity of the city is entitled to make a reasonable estimate of the volume discharged (Administrative Code, § 683a4-9.0, subd. b, par. 5). On September 1, 1959 he determined that the average retention of water by bakeries is 40%; and thereafter a firm could reduce by that much its sewer rent and surcharge, by simply applying for the reduction and showing that it was a bakery.

When the Bureau of Water Pollution Control in the Department of Public Works (the "Bureau") entered upon its duty of administering said local law, it found that it could not be done on a strict plant-by-plant basis due to the sheer magnitude of the task. Since individual samplings of each of the firms in even some of the 22 classified industries would have taken 10 to 20 years, the bureau decided to determine average pollutant concentrations for each industry based upon a representative cross section of the industry, in accordance with a schedule of priorities beginning with those apt to be the heaviest polluters (wholesale manufacturers), to be followed by those less likely to be surchargeable (retailers). For this reason, and because it was not known in advance whether a given plant or industry would produce excess pollutants, the Commissioner of Public Works determined not to exercise his power under the local law to require firms to modify their plumbing, so as to make themselves amenable to sampling, before he had a better idea of who would be surchargeable.

Soon after this Local Law No. 2 went into effect, and prior to the establishment of industry averages, the Commissioner invited all firms considered potentially surchargeable, including the plaintiffs, to have their own tests made and to submit the results, which would be accepted without question pending further sampling. Neither plaintiff elected to do so.

The industry-average principle, which is not uncommon in the sewage control field and which was indorsed by the expert witnesses at the trial, was embodied in the Rules and Regulations promulgated by the Commissioner on September 30, 1963. Subdivision (d) of section 9.4 provides that an appropriate industry average may be applied to a plant where sampling is impractical for physical, economic or other reasons. However, section 9.5 gives the plant the option of undergoing an individual sampling at its own expense if it prefers not to accept the average.

The wholesale bakery investigation began early in 1961 and continued until 1965. A list of wholesale bakers was compiled, consisting of all those firms licensed as such by the Department of Health of the city, supplemented by various manufacturers' directories. Each one was visited. Of the 300 or so firms found to do any wholesale baking, only about 50 produced sweetgoods, the ingredients of which are extremely high in pollutants, the remainder being bakers of bread, who produce little waste. Of the 50, only 17, among them the plaintiffs herein, produced a general range of sweetgoods. Seven of the 17 — not including the plaintiffs — were amenable to sampling without plumbing modifications and were found to represent a cross section of the industry in terms of products and housekeeping methods and in terms of large, medium and small volumes of water consumption. The seven were sampled in 1963 and 1964 during periods selected by themselves as characteristic of their operations. There was information indicating that the respective rates of waste concentration of the highest and of the lowest might have been influenced by certain unusual factors. Rejecting these extremes, in accordance with accepted scientific practice, the combined average, after deducting the allowable rate of pollutants (650 p.p.m., i.e., parts per million), yielded the figure 4,625 p.p.m. excess pollutant concentration, the industrial average for surcharging the sweetgoods baking wholesalers. If the extremes had not been discarded, the average would have been substantially higher.

In December, 1964, the plaintiffs and the other 41 wholesale sweetgoods bakers who had not been sampled were offered the alternatives of accepting the industry average or of undergoing individual sampling. If a plant were to choose the latter, it would have to make whatever installation was necessary for the purpose and the city would bear the cost of the testing and sampling procedures. It was estimated that such installation would have cost plaintiff Ebinger $4,000 and plaintiff Larsen $1,000. The plaintiffs did not exercise the option thus offered

them. Thereafter, early in 1965, the plaintiffs received bills from the City Collector for "sewer surcharge" for the four-year period commencing March 1, 1961, the effective date of Local Law No. 2 of 1961, computed on the basis of the average for the industry. Larsen's totaled about $36,000 and increased to about $41,096 by the time of trial; Ebinger's amounted to about $17,000, which increased to about $51,982 by trial time. Since Larsen had not applied for the 40% discount on volume for "in-product retention" of water allowed to commercial bakeries, and Ebinger had neglected to do so with respect to one of its three meters, these bills did not reflect any such allowance.

The plaintiffs protested to the Commissioner of Public Works concerning the use of the industrial average and the failure to allow the 40% discount on volume in the computations. After hearings, he rejected the protests. Thereafter, these consolidated actions were brought for declaratory judgments that Local Law No. 2 of 1961 and the Rules and Regulations of the Department of Public Works, insofar as they pertain to sewer surcharges, as applied, are illegal, and for incidental relief. We have concluded that, in finding for the plaintiffs after trial, the learned Special Term erred.

Preliminarily, it may be observed that legislation relating to the establishment and maintenance of sewers falls within the scope of the police power (*Matter of Jordan* v. *Smith*, 137 Misc. 341, affd. 254 N. Y. 585; *Hutchinson* v. *City of Valdosta*, 227 U. S. 303) and that the unconstitutionality of police power legislation must be demonstrated beyond any reasonable doubt (*Wiggins* v. *Town of Somers*, 4 N Y 2d 215, 218).

The Commissioner is empowered by the law in question to require the installation, by the regulated party and at its own expense, of equipment necessary for continuous or intermittent measurement. Those subject to regulation may be required to bear reasonable costs of regulatory investigation (*United States* v. *Darby*, 312 U. S. 100; *Bronx Gas & Elec. Co.* v. *Maltbie*, 268 N. Y. 278, 288). To invalidate such a law, the regulated party must prove that the cost is so great as to be unreasonable (*New Orleans Public Serv.* v. *New Orleans*, 281 U. S. 682, 687; *Matter of Fox Meadow Estates* v. *Culley*, 233 App. Div. 250, 251, affd. 261 N. Y. 506). The plaintiffs offered no evidence to show that, in the light of all the relevant circumstances, the nonrecurring costs of the required sampling chambers (Ebinger — $4,000; Larsen — $1,000) were so great as to be unreasonable.

The execution of the local law in question was by its terms largely entrusted to the discretion of the Commissioner; and he

was empowered, in subdivision e thereof, to make rules and regulations

" (b) regulating, restricting or prohibiting the discharge into the sewer system of any material or substance which is or may be detrimental or destructive to the sewer system or the treatment processes thereof " and

" (d) Such additional rules and regulations as may be necessary to protect personnel, the sewer system, and the treatment process thereof."

Subdivision (d) of section 9.4 of the Rules and Regulations promulgated by the Commissioner pursuant to the above provides in pertinent part: " The Commissioner may establish an industry wide average pollutant concentration of the wastes discharged into the sewer system by each industry. * * * Where sampling and gauging of a specific plant engaged in that industry is not practical for physical, economic or other reasons, this industrial average may be applied in determining the surcharge."

In considering whether subdivision (d) of section 9.4 is within the limits of the legislative grant, the rule of strict construction of a criminal statute is not applicable, since the administrative agency herein proceeded under the civil rather than the criminal provisions of the statute (*Securities & Exch. Comm.* v. *Joiner Corp.,* 320 U. S. 344, 353–355). Further, " we must take the entire act into consideration " (*People ex rel. Miller* v. *Martin,* 1 N Y 2d 406, 410) and " a case within the intention of a statute is within the statute, though an exact literal construction would exclude it " (*Matter of River Brand Rice Mills* v. *Latrobe Brewing Co.,* 305 N. Y. 36, 43).

In the light of the objects sought to be attained by this legislation and the responsibility for their achievement imposed upon the Commissioner, it must be concluded that Local Law No. 2 contemplates the adoption of regulations such as the one in question. Continuous universal sampling, which would be required under the strict construction accorded to the law by the Trial Judge, would completely vitiate the law. Even a one-time sampling of all wholesale firms which previous experience indicated would be likely to be surchargeable would have required 10 to 20 years. Consideration of feasibility and practicality is germane to constitutional issues (*Bowles* v. *Willingham,* 321 U. S. 503, 517). The testimony is that the use of industry averages is an accepted, scientifically respected practice. The law does not mandate universal sampling; definitional sections, such as those relied upon below, do not constitute a mandate for a specific procedure; and an administrative agency may adopt any

recognized alternative procedure in the absence of such a mandate (see *People* v. *Prince Jagendorf Greene*, 7 N Y 2d 42, 45).

Furthermore, at no time did the Commissioner insist that a firm accept the average for its industry. If a firm rejected the average, however, it would have to bear the costs of an individual sampling, as the law provides. This is in accord with the rule that, when an individual refuses to bear the costs prescribed by law for one who desires to have precise measurement, it is proper for an administrative agency to apply a reasonable estimate to such individual (cf. *Park Hill Estates* v. *D'Angelo*, N. Y. L. J., May 7, 1962, p. 18, col. 4, holding that frontage rates were properly applied to premises where the owner failed or refused to repair his water meter).

Nor was it unreasonable, in the circumstances, to apply the industrial average from the effective date of the law. Charges are not " retroactive " merely because they are computed at a later date. The bakery investigation began in 1961, when the law went into effect, and continued to 1965, with samplings for the average being taken in 1963 and 1964. Conditions once shown to exist are presumed to continue and this presumption may be applied backwards in time from a subsequent condition (see Richardson, Evidence [9th ed.], § 73; 2 Wigmore, Evidence [3d ed.], §§ 225, 382, 437). When the law first went into effect, the Commissioner invited all firms considered potentially surchargeable, including the plaintiffs, to have their own tests made and to submit the results, which would be accepted without question pending further sampling. If the plaintiffs had accepted this offer, the industry average would not have been applied to them from 1961 through 1964; nor would it have been applied to them subsequently if they had undergone an individual sampling at their own cost, as the law provides.

There was no denial of due process or of equal protection of the law in the establishment by the Commissioner of a schedule of priorities for testing based upon reasonable expectations as to which industries would be the heaviest polluters and upon proceeding thereon to investigate the wholesalers before the retailers. A reasonable classification under the police power does not result in a denial of equal protection of the law despite the fact of incidental inequality in practice (*Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78; see, also, *People ex rel. Durham Realty Corp.* v. *La Fetra*, 230 N. Y. 429, 447, app. dsmd. *sub nom. People ex rel. Brixton Operating Corp.* v. *La Fetra*, 257 U. S. 665); and, where universal enforcement would be impossible due to staff limitations, a reasonable selection made so as to maximize coverage does not offend against due process

(*Currin* v. *Wallace,* 306 U. S. 1). Absent intentional or purposeful discrimination, a reasonable classification will not be disturbed (*Snowden* v. *Hughes,* 321 U. S. 1, 8–10; *People* v. *Friedman,* 302 N. Y. 75, 80–81, app. dsmd. 341 U. S. 907).

The plaintiffs attack as arbitrary the procedures whereby the Commissioner arrived at the industry average for the sweet-goods wholesale bakers. In our opinion, this charge lacks merit. Concededly, his determinations in the premises must be upheld if they have warrant in the record and a reasonable basis in the law (*Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104, 108; *Matter of Park East Land Corp.* v. *Finkelstein,* 299 N. Y. 70, 75). Upon all the facts adduced, we find that the Commissioner correctly defined the scope of the industry and fairly tested a representative cross section thereof; and that the method whereby the average was derived from the results of the test was proper. In order to form a basis for judicial intervention, it must be demonstrated that the method used in determining the amount of polluted waste water discharged into the city sewers by respective baking concerns was clearly arbitrary, haphazard, speculative, unreasonable and without authority or foundation (cf. *Matter of Kayfield Constr. Corp.* v. *Morris,* 15 A D 2d 373; *Matter of Kaelber* v. *Sahm,* 281 App. Div. 980, affd. 305 N. Y. 858; *Matter of Graziani* v. *Rohan,* 10 A D 2d 154, affd. 8 N Y 2d 967). In our opinion, the plaintiffs have not met that burden.

A question remains about the accuracy of the bills that were rendered to the plaintiffs. They contend that the volume for which they were charged was incorrectly computed and arbitrarily applied, in that the 40% reduction for "in-product" retention of water allowed for the asking was not given to them because the department concerned said the "reduction is not retroactive". Ebinger had made timely application for, and received, the allowance on city water measured by two of its meters, but not for its well water measured by a third meter. Larsen had made no application for the allowance. The plaintiffs also contend that, in the case of Ebinger, its well water should not have entered into the calculations at all, since it was used only for refrigeration and air conditioning.

The claim respecting the well water requires little discussion, since it is not the source of supply that matters here but the medium of disposal, and it is undisputed that after circulating in the cooling system the water in Ebinger's plant, as in the plants tested, is discharged into the sewer. It is not disputed that, in determining that the average retention of water by bakeries is 40%, due allowance was made by the city for

the fact that water used for refrigeration in the baking industry does not enter into the baking process.

However, the plaintiffs' claim that they should have been given the 40% credit in the surcharge bills as of their inception, notwithstanding their failure to make timely application therefor, seems not without merit. While ordinarily it would appear to be reasonable and perhaps necessary departmental requirement, for the orderly conduct of government business, that applications such as these be filed by a certain specified date, the unusual circumstances here — that it was not possible until 1965 to compute and render the surcharge bills for the periods commencing in 1961 — seem to make adherence to such requirement unduly harsh and hence unreasonable.

Accordingly, the judgment should be reversed, on the law and the facts, without costs, and the case should be remanded to the trial court for (1) determination of the proper sewer surcharges as to each plaintiff, taking into consideration as to Larsen a 40% reduction in the total volume of water intake and as to Ebinger a 40% reduction in the volume registered by its water meter No. 6-71 89; and (2) entry of judgment (a) declaring that section 687-1.0 of the Administrative Code of the City of New York and the Rules and Regulations issued pursuant thereto by the Commissioner of Public Works of the City of New York are constitutional insofar as they pertain to sewer surcharges as applied to the plaintiffs on the basis of the industry average, (b) directing that the defendant (i) make such refunds to the plaintiffs to which they may be entitled because of payments made by them in excess of the proper sewer surcharges and (ii) correct the record of liens for any unpaid amounts, and (c) awarding costs and disbursements of the action to the plaintiffs against the defendant.

BELDOCK, P. J., BRENNAN, HOPKINS and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Kings County, entered January 11, 1967, in favor of plaintiffs after a nonjury trial, reversed, on the law and the facts, without costs, and case remanded to the trial court for (1) determination of the proper sewer surcharges as to each plaintiff, taking into consideration as to Larsen a 40% reduction in the total volume of water intake and as to Ebinger a 40% reduction in the volume registered by its water meter No. 6-7189; and (2) entry of judgment (a) declaring that section 687-1.0 of the Administrative Code of the City of New York and the Rules and Regulations issued pursuant thereto by the Commissioner of Public Works of the

City of New York are constitutional insofar as they pertain to sewer surcharges as applied to plaintiffs on the basis of the industry average, (b) directing that defendant (i) make such refunds to plaintiffs to which they may be entitled because of payments made by them in excess of the proper sewer surcharges and (ii) correct the record of liens for any unpaid amounts and (c) awarding costs and disbursements of the action to plaintiffs against defendant.