### JACOBS, Acting Adm'r of Wage and Hour Division, Department of Labor, v. PEAVY–WILSON LUMBER CO., Inc.
### No. 213.

District Court, W. D. Louisiana, Shreveport Division.

May 14, 1940.

George A. McNulty, Gen. Counsel, of Washington, D. C., Conley Merchant, Regional Atty., of Birmingham, Ala., and Irving J. Levy, Asst. Gen. Counsel, C. Ira Funston, Senior Atty., Bessie Margolin, and David S. Polier, all of Washington, D. C., for plaintiff.

John B. Files, of Shreveport, La., J. W. Peavy, of Lufkin, Tex., and Maguire, Voorhis & Wells, of Orlando, Fla., for defendant.

PORTERIE, District Judge.

On December 13, 1939, plaintiff filed his complaint in this court seeking to enjoin defendant from violating the provisions of Sections 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938 (Act of June 25, 1938, c. 676, 52 Stat. 1060, U. S.C., Title 29, Sec. 201, et seq., 29 U.S.C.A. § 201 et seq.).

Defendant is a corporation organized and existing under the laws of the State of Louisiana, and maintaining its principal office in this state. Its manufacturing plant and main sales office are located at Holopaw, Osceola County, Florida, where it owns and operates a large sawmill and planing mill, a lumber yard and various timber lands, and is engaged in the general lumber manufacturing business. It employs approximately four hundred employees and ships a substantial portion of its manufactured lumber in interstate commerce.

The Act (Section 6) requires the payment of a minimum wage (twenty-five cents an hour during the first year after October 24, 1938, and thirty cents for the next six years) to all employees engaged in interstate commerce or in the production of goods for interstate commerce. It prohibits the shipment in interstate commerce of goods produced in violation of the Act, Section 15(a) (1), and makes unlawful the failure to pay the minimum wage to persons engaged in interstate commerce

or the production of goods therefor. Section 15(a) (2).

The Act defines "wage" to include the "reasonable cost, as determined by the Administrator," to the employer of furnishing employees with "board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees". Section 3(m).

On October 20, 1938, the Administrator of the Wage and Hour Division, acting under and pursuant to the authority conferred upon him by Section 3(m) of the Act, issued certain regulations fixing the method of determining the reasonable cost of furnishing the above-mentioned facilities (Regulations, Part 531). The regulations provide that the reasonable cost of company houses rented to the employee and of any other capital investments used in furnishing board, lodging, or other facilities, is to be the cost of operation and maintenance, including depreciation due to wear and tear, plus a reasonable allowance (not more than 5½ per cent.) for interest on the depreciated amount of capital invested. It is further provided that reasonable cost shall in no case exceed the fair rental value of the property, and shall not include a profit to the employer.

Defendant has filed motions which incorporate (1) a motion to strike the allegations of the complaint relating to the regulations issued pursuant to Section 3(m) of the Act; (2) a motion to dismiss the complaint, and (3) a motion for a bill of particulars.

The motion to strike is made on the ground that the allegations in question are immaterial for the reasons that: (1) Section 3(m) of the Act, for many reasons, is not applicable to the deductions described in the complaint; (2) if Section 3(m) is held applicable, it is unconstitutional; and (3) there has been no valid determination of reasonable cost by the administrator pursuant to Section 3(m) of the Act.

The motion to dismiss is based, primarily, on the claim that the pertinent provisions of the Fair Labor Standards Act are unconstitutional; or, secondarily, on the claim that the administration of the Act, in many ways, is unconstitutional.

The motion for a bill of particulars requests that plaintiffs supply, among other things, the names of the employees from whose wages illegal deductions are claimed to have been made; the names of the employees engaged in the production of goods for interstate commerce; the amounts of wages paid to each of them, and the dates of such payments; the particular amounts of the illegal deductions; and other data similar in character.

It is necessary, though it adds to the length of this opinion, to quote the most important articles of the petition of the plaintiff. A reading of them will disclose very few facts alleged, but many conclusions urged. This gives trouble in ruling on the motion to dismiss, because, with this generality of conclusion, the mind is left free to enter into scores of factual contingencies. The elaboration of these contingencies has taken eighty pages in the briefs of plaintiff and two hundred eighty-eight pages in the briefs of defendant. No criticism is here implied of the defendant's counsel, for their objections are well and legally deduced. The objections are numerous, and, because of the paucity of facts in the plaintiff's petition, the defendant is enabled to conjecture at will as to suppositional facts. But for the one fact alleged—the giving of scrip in payment of wages, discounted at 10% for cash, bringing the wage below the minimum —the court should dismiss the petition.

Here are the articles:

"V. That in connection with its business of manufacturing and producing lumber the defendant, commencing with the workweek beginning October 24, 1938, the effective date of the Act, and continuing to the date hereof, paid to many of its employees while engaged in the production of goods for interstate commerce and in processes and occupations necessary to such production, certain cash wages and deducted therefrom certain charges for the furnishing of homes as living quarters for said employees, for medicines and drugs, and for clothing, groceries, foodstuffs, meats, and other commodities, all of which were customarily furnished by said defendant to said employees."

"VII. That the amounts deducted by the defendant for such services, facilities, and commodities were far in excess of the reasonable cost of furnishing the same to said employees within the meaning of the Act and the regulations above set forth and were grossly excessive, exorbitant, oppressive and unreasonable and included in such charges a substantial profit to said defendant, and such grossly excessive, exorbitant, oppressive and unreasonable

charges and deductions were calculated to and actually did result in the payment to said employees while so engaged in the production of goods for interstate commerce and in processes and occupations necessary to such production of wages of less than 25 cents an hour for the period commencing on October 24, 1938, and continuing to October 23, 1939, and less than 30 cents an hour for the period from October 24, 1939, down to date, in violation of Sections 6 and 15(a) (2) of the Act.

"VIII. That during the workweeks beginning October 24, 1938, the effective date of the Act, and continuing to June 1, 1939, the defendant issued scrip to many of its employees while engaged in producing goods for interstate commerce, and in processes and occupations necessary to such production, in lieu of cash wages, which scrip coupons were discounted directly by said defendant at 90 percent of its face value and at 90 percent of the amount due to said employees as wages.

"IX. That since June 1, 1939, and down to the date hereof, the defendant has continued to discount said scrip at 90 percent of its face value and at 90 percent of the amount due to said employees as cash wages through a company barber as an intermediary and as a dummy in connection therewith, at a substantial profit to the defendant herein.

"X. That the issuance of said scrip and the discounting thereof by the defendant was calculated to and actually did result in the payment to many of its employees for work done while actually engaged in the production of goods for interstate commerce, and in processes and occupations necessary to such production, of wages which were less than 25 cents an hour for the period commencing October 24, 1938, down to and including October 23, 1939, and less than 30 cents an hour for the period commencing October 24, 1939, down to date, in violation of Sections 6 and 15(a) (2) of the Act.

"XI. That the defendant has violated Section 6 of the act in that by means of all of the foregoing unreasonable, exorbitant and oppressive deductions for housing accommodations, drugs, medicines, and other commodities and by the issuance of scrip in lieu of cash wages, and by discounting said scrip as above set forth, the defendant has paid to its employees while engaged in the production of goods for interstate commerce and in processes and occupations necessary to such production, wages which are less than 25 cents an hour for the period commencing October 24, 1938, down to and including October 23, 1939, and wages which are less than 30 cents an hour for the period from October 24, 1939 to date."

The Supreme Court of the United States in the case of West Coast Hotel Company v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330, upheld the constitutionality of a minimum wage law for women. The Fair Labor Standards Act of 1938, the constitutionality of which is at issue here, is the establishment of a minimum wage and a maximum hour law for all who labor. The reasoning, by Chief Justice Hughes, in the West Coast Hotel v. Parrish case, is so clearly applicable and all-encompassing in support of the constitutionality of the Fair Labor Standards Act that we quote from the decision generously:

" * * * The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described.

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to govern-

ment the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U.S. 549, 565, 31 S.Ct. 259, 262, 55 L.Ed. 328.

"This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable. Thus statutes have been sustained limiting employment in underground mines and smelters to eight hours a day (Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780); in requiring redemption in cash of store orders or other evidences of indebtedness issued in the payment of wages (Knoxville Iron Co. v. Harbison, 183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55); in forbidding the payment of seamen's wages in advance (Patterson v. The Bark Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002); in making it unlawful to contract to pay miners employed at quantity rates upon the basis of screened coal instead of the weight of the coal as originally produced in the mine (McLean v. Arkansas, 211 U.S. 539, 29 S.Ct. 206, 53 L.Ed. 315); in prohibiting contracts limiting liability for injuries to employees (Chicago, Burlington & Quincy R. Co. v. McGuire, supra); in limiting hours of work of employees in manufacturing establishments (Bunting v. Oregon, 243 U.S. 426, 37 S.Ct. 435, 61 L.Ed. 830, Ann. Cas.1918A, 1043); and in maintaining workmen's compensation laws (New York Central R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629; Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642). In dealing with the relation of employer and employed, the Legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression. Chicago, Burlington & Quincy R. Co. v. McGuire, supra, 219 U.S. 549, at page 570, 31 S.Ct. 259, 55 L.Ed. 328.

"The point that has been strongly stressed that adult employees should be deemed competent to make their own contracts was decisively met nearly forty years ago in Holden v. Hardy, supra, where we pointed out the inequality in the footing of the parties. We said (Id., 169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780):

" 'The legislature has also recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules, and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority.'

"And we added that the fact 'that both parties are of full age, and competent to contract, does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself.' 'The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer.' " 57 S.Ct. 581–583.

"There is an additional and compelling consideration which recent economic experience has brought into a strong light. The exploitation of a class of workers who are in an unequal position with respect to bargaining power and are thus relatively defenseless against the denial of a living wage is not only detrimental to their health and well being, but casts a direct burden for their support upon the community. What these workers lose in wages the taxpayers are called upon to pay. The bare cost of living must be met. We may take judicial notice of the unparalleled demands for relief which arose during the recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved. It is unnecessary to cite official statistics to establish what is of common knowledge through the length and breadth of the land. While in the instant case no

factual brief has been presented, there is no reason to doubt that the state of Washington has encountered the same social problem that is present elsewhere. The community is not bound to provide what is in effect a subsidy for unconscionable employers. The community may direct its law-making power to correct the abuse which springs from their selfish disregard of the public interest." 57 S.Ct. 585.

The minimum wage at twenty-five cents per hour, forty hours per week, is forty dollars per month; at thirty cents per hour, the monthly wage is forty-eight dollars—a bare subsistence.

Justice Hughes is dealing with the limitation upon state action under the Fourteenth Amendment. The instant case deals with the limitation imposed by the Fifth Amendment upon federal legislation. In United States v. Rock Royal Co-Op., 307 U.S. 533, 569, 59 S.Ct. 993, 1011, 83 L.Ed. 1446, decided June 5, 1939, the Court said: "The authority of the Federal government over interstate commerce does not differ in extent or character from that retained by the states over intrastate commerce."

In Nebbia v. New York, 291 U.S. 502, 524, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469, the Court asserted: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare."

We hold, therefore, that the Fair Labor Standards Act of 1938, as written—without considering administrative interpretations, some of which are a part of this case—is constitutional. Art. 1, Sec. 8, Cl. 1, U.S. Constitution: Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Kentucky Whip & Collar Co. v. Illinois Central Railroad Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Santa Cruz Co. v. Labor Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; see Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724.

A number of its sections have been upheld already as to constitutionality by district courts. The separability as to constitutionality of the several sections provided by the Act has permitted piecemeal adjudications. Andrews, Administrator, etc. v. Montgomery Ward & Co., Inc., et al., D.C., 30 F.Supp. 380; United States v. Feature Frocks, Inc., et al., D.C.N.D.Ill., December 27, 1939, 33 F.Supp. 206; United States v. Chicago Macaroni Co., et al.,[1] D.C.N.D.Ill., Dec. 4, 1939; United States v. Walters Lumber Co. et al., (United States v. Florida Fruit & Produce Co., Inc., et al., United States v. Industrial Rag Co.) D.C.S.D.Fla., March 13, 1940, 32 F.Supp. 65; Williams, et al. v. Atlantic Coast Line R. R. Co.,[1] D.C.E.D.N.C., Feb. 19, 1940; Clifton I. Morgan and United States of America and Harold D. Jacobs, Administrator of the Wage & Hour Division, United States Department of Labor, Intervenors v. Atlantic Coast Line R. R. Co., D.C.S.D.Ga., April 29, 1940, 32 F. Supp. 617; but see United States of America v. F. W. Darby Lumber Co. and Fred W. Darby, D.C.S.D.Ga., April 29, 1940, 32 F.Supp. 734.

Quite recently, the minimum wage and maximum hour features of this law were upheld by the Circuit Court of Appeals for the 5th Circuit, Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division of Department of Labor, 5 Cir., April 2, 1940, 111 F.2d 23.

The sum of these decisions is that substantially the whole act has been maintained.

The constitutionality of the phrase "board, lodging, or other facilities" in Section 3(m), interpreted so as to include "medicines and drugs, clothing, groceries, foodstuffs, meats and other commodities", has not been decided.

■ The manner of administration under the Act, granting its validity vel non, is pleaded by defendant, in many ways, to be unconstitutional. Clear and definite facts must be had to satisfy inquiry into the constitutionality of administrative provisions. More, we have administrative provisions to consider in connection with a particular factual background—a general lumber manufacturing business. The factual background is further detailed in that the enterprise in this case has several activities—the operation of a sawmill, comprising the felling of the trees in the forest, the hauling of the logs from the forest to

---

[1] No opinion for publication.

the mill, then the sawing of the logs into rough lumber, followed by the manufacture of the rough lumber into the finished product to be sent into interstate commerce; currently with all of the above operations is the general merchandising through a company store, where the employees do their buying; also the renting by the Company of living quarters to all employees.

■ There is nothing in the petition alleging what are the exact wages paid by the defendant. The allegations of the petition as to the loss of 10% on the scrip that is given to the laborer as his wages, of itself, would immediately turn the case against the defendant, if the defendant pay the bare minimum wage. If the price paid the laborer be substantially above the minimum established by law, the 10% deduction could be permitted under freedom of contract, still leaving the clear minimum to the laborer, thus not violating the Act. We believe we have given enough suppositions to show the absolute need for facts.

This case involves issues of law directly affected by facts; the controlling facts are not yet before us. In such cases, on appeal from premature rulings of lower courts, the Supreme Court of the United States has not hesitated to refuse decision and to return the case to the lower court for the facts. See Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841; Hammond v. Schappi Bus Line, 275 U.S. 164, 48 S.Ct. 66, 72 L.Ed. 218; Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; Mayo v. Lakeland Highlands Canning Co., Inc., Feb. 26, 1940, 60 S.Ct. 517, 84 L.Ed. ——.

■ There is strong presumption in favor of the constitutionality and validity of an act of Congress. O'Gorman & Young, Inc. v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234; Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 79 L.Ed. 1070. The same·principle applies in favor of administrative interpretations. The merits of the case should be reached before the stamp of unconstitutionality is placed. Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; American T. & T. Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142.

The motion of the defendant to dismiss has forty-seven grounds, none of which is frivolous. We have analyzed each ground, and, if substantiated by evidence and not left to factual conjecture, any one of the grounds might be sufficient to sustain the motion. Every single one of the grounds urged for dismissal by the defendant is reserved to it, the present ruling is without prejudice, and the motion to dismiss is, accordingly, referred to the merits.

■ The motion to strike has forty reasons, all of a serious character and based upon some supposition which, because of the paucity of the present pleadings, is readily imagined. To sustain the motion to strike would eliminate the petition of plaintiff—there would be nothing left of it. We overrule the motion to strike, for to sustain the motion would shut out all the facts—most of which are relevant, material, and necessary.

We reach now the bill for particulars. By granting a bill, a court may restrict unreasonably the plaintiff's case; by refusing a bill, a court may expose the defendant to surprise at trial.

■ The information sought by defendant is peculiarly within defendant's knowledge. The names of the employees whose wages are subjected to illegal deductions, if any, the names of the employees engaged in the production of goods for interstate commerce, if any, the dates and amounts of wages paid each, particular amounts of the illegal deductions, if any, are all well known to the defendant itself. Its officers, agents and representatives know all of the facts relative to the wages paid to persons in its employ. It has its own books and records to give the information. The defendant could hardly be surprised at trial.

We overrule the motion for a bill of particulars. Bodine v. First National Bank of Merchantville, D.C., 281 F. 571; United States Hoffman Mach. Corp. v. Modern P. Appliances, D.C., 33 F.2d 991; Curtis v. Phelps, D.C., 209 F. 261; United Lace & Braid Mfg. Co. v. Barthels Mfg. Co., D. C., 213 F. 535; Shryock v. S. P. Calkins & Co., 4 Cir., 248 F. 649; Page Steel & Wire Co. v. Blair Engineering Co., 3 Cir., 22 F.2d 403; Sure-Fit Products Co. v. Med-Vogue Corporation, D.C., 28 F.Supp. 489. Under the new rules, see Kraft Corrugated Containers, Inc. v. Trumbull As-

phalt Co. of Delaware, D.C., 31 F.Supp. 314.

In the application of the administrative details of the Act, the court needs more facts, which could only come by hearing the case on the merits in order to determine whether there is or not a taking of property without due process of law. The case cannot be justly and intelligently decided in its present status. The factual background is too indefinite for a decision to be satisfactorily made. Judicial condemnation of the administrative details under an act, otherwise valid, should leave no disturbing doubt with the court.